IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| REBECCA SPENCE, a/k/a Khadijah Spence,<br><br>          Plaintiff,<br><br>     v.<br><br>HONORABLE ANTHONY FOXX,<br>Secretary of Transportation<br><br>          Defendant. | HONORABLE JEROME B. SIMANDLE<br><br>Civil No. 11-3972 (JBS/AMD)<br><br><br>          **OPINION** |

APPEARANCES:

Hyder A. Naqvi, Esq.
AHMED NAQVI RODRIGUEZ LLP
22 Cortland Street, 16th Floor
New York, NY 10007
     Attorney for Plaintiff

Paul J. Fishman
United States Attorney
     By: Irene E. Dowdy
     Assistant United States Attorney
OFFICE OF THE UNITED STATES ATTORNEY
401 Market Street, 4th Floor
P.O. Box 2098
Camden, NJ 08101
     Attorneys for Defendant

**SIMANDLE**, Chief Judge:

## I.    INTRODUCTION

Plaintiff Rebecca Spence filed this action for employment discrimination after she was terminated from her position as an analyst at the Federal Aviation Administration ("FAA") Tech Center in Atlantic City, New Jersey less than a year after she

was hired. Spence, who is African American and Muslim, alleges that she was fired on the basis of her religion, race, and national origin. She also alleges that the FAA retaliated against her for filing a discrimination complaint with the FAA's Equal Employment Opportunity ("EEO") Office after she was terminated.

In the Complaint filed on July 11, 2011, Spence named Ray LaHood, then Secretary of Transportation; the Department of Transportation ("DOT"); and the FAA as defendants. Spence brought six claims: discrimination on the basis of race, religion, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); retaliation in violation of Title VII; retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981; and racial and religious discrimination and retaliation in violation of the New Jersey Law Against Discrimination ("LAD"), N.J. Stat. Ann. § 10:5-1, et eq.

In an Opinion dated January 28, 2013 this Court granted Defendant's motion to dismiss with prejudice all claims against the FAA and DOT, as well as the claims brought under § 1981 and the New Jersey LAD. The Court also dismissed without prejudice a hostile work environment claim, to the extent Plaintiff included such a claim in her Complaint, for failure to state a claim, and

permitted Plaintiff to file an Amended Complaint within fourteen days to cure the deficiencies noted in the Opinion. Plaintiff did not file an Amended Complaint.

Four claims remain before this Court: discrimination on the basis of race, religion, and national origin in violation of Title VII, and retaliation in violation of Title VII. Secretary of Transportation Anthony Foxx is the sole remaining defendant.[1]

Defendant has moved for summary judgment on all claims. For the reasons explained below, the Court will grant Defendant's motion.

## II.  SUMMARY JUDGMENT RECORD

The Court begins with the summary judgment record. Although plaintiff Rebecca Spence argues that several facts are in dispute, a careful examination of the record reveals that the material facts are largely undisputed. Rather, it is the parties' characterizations of the facts that are in dispute.

Rebecca Spence is African American. She is a practicing Muslim, and wears a traditional head covering at all times in public. (Def. Statement of Undisputed Material Facts ("Def. SMF") [Docket Item 46-2] ¶¶ 1-2; Decl. of Rebecca A. Spence

---

[1] Because Ray LaHood is no longer the Secretary of Transportation, his successor, Anthony Foxx, is automatically substituted as the party defendant under Fed. R. Civ. Pro. 25(d)(1).

("Spence Decl.") [Docket Item 54-1], Ex. A to Naqvi Decl. ¶ 3.)

In the fall of 2009, Spence submitted an online job application for a permanent position as a program analyst at the FAA's William J. Hughes Technical Center ("Tech Center") in Atlantic City. The position was for the Test Standards and Program Assessment Team in the Technical Strategies and Integration Group, of which John Wiley was the Manager. (Def. SMF ¶¶ 4-5.)

In the job application, Spence answered "yes" to whether she was claiming a "10-point veteran preference as the spouse, widow, widower or natural mother of a disabled or deceased veteran." (Appl. of Rebecca Spence ("Spence Appl.") [Docket Item 46-5], Ex. 4 to Dowdy Decl.) Eligibility to claim a veteran's preference is contained in 5 U.S.C. § 3309 and § 2108. Under § 2108(3)(E), the spouse of a disabled veteran is "preference eligible" if the disabled veteran "has been unable to qualify for any appointment in the civil service or in the government of the District of Columbia." 5 U.S.C. § 2108(3)(E). Section 3309 entitles preference-eligible spouses to 10 additional points on an entrance exam into competitive service.

In addition to the statutory provision, the U.S. Office of Personnel Management ("OPM") publishes a guidance called the VetGuide to explain the various veterans' preferences that are

4

available to those seeking positions in the federal civil
service. The FAA follows the VetGuide in determining whether
candidates for employment may receive a veteran's preference.
(Def. SMF ¶ 18.) According to the VetGuide, if a veteran who is
disabled due to a service-connected injury cannot use the
employment preference for him- or herself, the spouse of the
disabled veteran may be eligible for the preference. However,
the VetGuide states that the spouse may not receive the
preference "if the veteran is living and is qualified for
Federal employment." (Def. SMF ¶ 21; U.S. Office of Personnel
Management, VetGuide ("OPM VetGuide"), Ex. 1 to Dowdy Decl.
[Docket Item 46-5], at 9.) The VetGuide lists three
circumstances in which a veteran is presumed "disqualified for a
Federal position" and cannot use the preference themselves:

> Such a disqualification may be presumed when the
> veteran is unemployed and
> - is rated by appropriate military or Department of
>   Veterans Affairs authorities to be 100 percent
>   disabled and/or unemployable; or
> - has retired, been separated, or resigned from a
>   civil service position on the basis of a
>   disability that is service-connected in origin;
>   or
> - has attempted to obtain a civil service position
>   or other position along the lines of his or her
>   usual occupation and has failed to qualify
>   because of a service-connected disability.

(OPM VetGuide, at 9.) The VetGuide further states that the
derived preference "may be allowed in other circumstances but

5

anything less than the above warrants a more careful analysis." (Id.)

It was this derived preference for which Spence claimed eligibility in her job application. The FAA's Human Resources office received a total of 59 online applications for the position, which included applications from both internal and external candidates. The position was available to candidates at three Grades/Levels: Grade/Level 7, Grade/Level 9, and Grade/Level 11. All internal candidates who met the minimum qualifications for each Grade/Level were referred to managers for additional screening. But only the external candidates who were qualified for the position and who had claimed a veteran's preference on their application were referred. (Def. SMF ¶ 16.) Spence, an external candidate, was referred because she met the minimum qualifications for the position and had checked that she was eligible for a veteran's preference. She was one of two external candidates referred for the position at Grade/Level 11. Approximately four other candidates were placed on the external referral list for the other grades. (See external referral lists, Exs. 8-10 [Docket 46-6].) Because Spence claimed a 10-point derived veteran's preference on her application, she was considered a Priority Group II candidate. The other candidate at Grade/Level 11, a veteran who claimed a service-connected

disability rating of 30 percent or more, was classified as a Priority Group I candidate. (Def. SMF ¶ 26.)

Spence was chosen for the program analyst position in September 2009. In October 2009, sometime after she received a formal offer of employment, Spence met with Jan Edwards, a specialist from the Human Resources Office and discussed the outstanding documentation she needed to support her derived veteran's preference claim. (Def. SMF ¶ 33-34; Decl. of Jan Edwards ("Edwards Decl.") [Docket Item 46-3] ¶ 27.)

At the meeting, Edwards asked Spence for two documents: a certificate of discharge from active service from the Department of Defense, which serves as proof that her husband was a veteran, and a letter from the Department of Veterans Affairs ("VA") showing that her husband had suffered a service-connected injury and indicating the percentage of his disability. (Edwards Decl. ¶ 28.) Spence provided the certificate of release but told Edwards that she was still waiting for a response from the VA regarding her husband's disability rating. (Def. SMF ¶ 36; Edwards Decl. ¶ 28.) The parties agree that Spence never told Edwards that her husband was 100 percent disabled. (Pl. Supplemental Statement of Facts ("Pl. Supp. SMF") [Docket Item 53] ¶ 5; Def. Resp. to Pl. Supplemental Statement of Facts ("Def. Resp. to Supp. SMF") [Docket Item 56-1] ¶ 5.)

Also at the meeting, Edwards told Spence that she needed to fill out a Standard Form 15 ("SF-15"), also known as an Application for 10-Point Veteran Preference, which Spence did. (Def. SMF ¶ 37; Edwards Decl. ¶ 30.) The SF-15 requires spouses claiming a 10-point derived veteran's preference to provide a VA disability rating letter, which Edwards had already asked for. The form also required Spence to answer several additional questions about her husband's employment history as documentation of her husband's inability to work. (Ex. 16 to Dowdy Decl.) In response to the additional questions, Spence marked that her husband was not currently working, that he had never been employed by the federal civil service, and that he had never resigned from, been disqualified for, or separated from a federal civil service position because of a service-connected disability. She also marked that her husband was not receiving a civil service retirement pension. (Id.)

The parties dispute some of what Spence said to Edwards during that meeting. According to Defendant, Spence explained to Edwards that her husband had served in the Air Force and was recently separated from his military service due to a service-connected injury. Spence also told Edwards that her husband was unemployed and unable to work due to his injury. (Def. SMF ¶ 34; Edwards Decl. ¶ 27.) Spence claims, and Defendant disputes, that

in addition, Spence specifically told Edwards that her husband
had attempted to apply for other civilian jobs, including desk
jobs, and had not been able to obtain any employment, federal or
otherwise. (Pl. Supp. SMF ¶ 6.)

In addition, Spence brought in a copy of a Special Order
AR-143 from the New Jersey Air National Guard ("NJANG").[2] The
Special Order noted that Spence's husband had been honorably
discharged in June 2009 "from the NJANG and as a member of the
Air Force Reserve," and was relieved from his assignment with
the 177th Aircraft Maintenance Squadron. It also stated that he
was entitled to disability severance pay. (Ex. 19 to Dowdy Decl.
[Docket Item 46-8].)

Spence was employed at the FAA Tech Center for a little
under a year. Throughout that time, according to Spence, various
employees at the FAA made negative comments to her about her
head covering and religion. (Pl. Supp. SMF ¶ 13.)[3] Three of the

---

[2] The parties dispute whether Special Order AR-143 was provided
to the FAA's HR office in the fall of 2009 or in July 2010 after
an internal audit review. (Def. SMF ¶¶ 36, 49; Pl. Counter
Statement of Facts in Opp. to Def. Mot. for Summ. J. ("Pl.
Counter SMF") [Docket Item 53], Resp. to ¶ 36.) However, both
parties agree that the HR office received Special Order AR-143
prior to Spence's termination in October 2010.
[3] Spence listed a little over two dozen incidents in which
negative comments were made about her head covering or religion.
The majority of the comments were made by Spence's co-workers or
other FAA employees, none of whom Spence alleges played a role
in the decision to terminate her. (See, e.g., Pl. Supp. SMF ¶ 13
(five statements by John Wilkes, "FAA FOIA Representative,"

comments were made by Spence's managers. Spence states that John Wiley, the manager of the Technical Strategies and Integration Group who signed off on her hire, "repeatedly" told her, "They don't like Muslims." (Id.) John Wiley also commented to her, "It was bad enough having one, now there's two." (Id.) In addition, Spence claims that in June 2010, soon after she was reassigned to a new work team under a new supervisor, Isidore Venetos, Venetos made a negative comment to Spence about the Quran. According to Spence, Venetos called her into his office shortly after the reorganization to discuss her duties. During that conversation, Venetos told her that purchased a Quran because he "just wanted to understand [her] and [her] religion." (Pl. Supp. SMF ¶ 11, 13.) Spence believed that Venetos assumed she was Muslim because of her head covering. (Spence Decl. ¶ 12.) Venetos did not recall saying this to Spence, but stated that he may have mentioned to her in a passing conversation that he had bought a Quran after taking a class at NYU on different faiths. (Deposition Transcript of Isidore Venetos ("Venetos Dep.") [Docket Item 54-4], Ex. D to Naqvi Decl., at 82:19-84:25.)

In July 2010, approximately two months before Spence was

---

statements by "[a] fellow employee," "[a] union representative," an "FAA personnel representative," "[f]ellow workmate," and "fellow employees").) Several other comments were made by individuals whom Spence does not identify. (Id. (statements by "Joe Komisnaly," "Bessie Johnson," and "Bessie L/N/U").)

fired, the HR Office at the Tech Center was audited by an internal review team. (Def. SMF ¶ 43.) The audit was the first of its kind for the FAA Tech Center. (Dep. of Thomas Wood ("Wood Dep.") [Docket Item 54-6], Ex. F to Naqvi Decl., at 12:2-13:3.) The audit team randomly selected a number of personnel actions to review, and Spence's file was among those selected. During the course of the audit, the audit team found that Spence's file did not contain adequate documentation of Spence's eligibility for the 10-point derived veteran's preference. (Def. SMF ¶ 44-45; Edwards Decl. ¶¶ 36-37; Decl. of Thomas Wood ("Wood Decl.") [Docket Item 46-4] ¶ 4.)

Edwards learned of the audit team's finding from her direct supervisor, Donna Young-Talley, who directed Edwards to email Spence for additional documentation she could give to the auditors. (Edwards Decl. ¶ 37.) Spence had received a determination letter from the VA three months prior concerning her husband's disability rating, and she gave the letter to Edwards. (Def. SMF ¶ 50.) The VA had determined that her husband was entitled to compensation for a service-connected disability and rated her husband's disability at 30 percent. (Ex. 20 to Dowdy Decl. [Docket Item 46-9].)

A few days later, Edwards emailed Spence again, noting that the letter from the VA showed that Spence's husband was not 100

11

percent disabled. In her email, Edwards wrote that the HR office

> [did] have the documentation that your husband has a
> service-connected disability, but not evidence that he
> is either (1) 100 percent disabled; **OR** (2) has
> retired/separated/resigned from a civil service
> position, OR (3) has attempted to obtain a civil service
> position along the lines of his usual occupation and has
> failed to qualify because of his disability.

(Ex. 21 to Dowdy Decl. [Docket Item 46-9].) Edwards copied the

OPM VetGuide criteria into her email. (Id.) Spence replied that

she "did not have the documentation noted in [Edwards'] email."

(Ex. 22 to Dowdy Decl. [Docket Item 46-9].)

Shortly thereafter, on July 27, 2010 the audit team sent a

memorandum summarizing their findings to Thomas Wood, the

Director of the Human Resource Management Office. Spence's

appointment was listed in the "Regulatory Violations" section

with the following finding:

> Selection of Rebecca Spence for a Management and
> Program Analyst, FG-343-11. Unable to substantiate
> eligibility for 10pt Derived Preference. File does not
> contain evidence of eligibility for spousal
> preference. If no documentation is found, then this is
> an illegal appointment, since there was another
> preference eligible (with a CPS rating) within reach
> on the certificate.

(Ex. 23 to Dowdy Decl. [Docket Item 46-9].) Around that time,

Wood met with Spence to discuss her eligibility for the derived

veteran's preference. Wood recalled that during this meeting, he

explained that the audit had found that there was insufficient

support in her file for the veteran's preference. He asked

12

Spence "whether her husband had ever held a federal civil service position and whether her husband had ever applied for one." Spence replied that he had not. (Wood Decl. ¶ 12; Wood Dep., at 30:4-7.)

Wood believed that the documentation Spence had provided – the VA letter rating her husband's disability at 30 percent, the Special Order AR-143, the certificate of release, and the SF-15 – did not show that Spence qualified for a derived veteran's benefit under the OPM VetGuide criteria. If Spence did not qualify for the benefit, she would not have been hired because her name would not have been included on the referral list. (Def. SMF ¶ 56; Wood Decl. ¶ 13.) Wood believed that if Spence could not demonstrate eligibility for the derived preference by providing the necessary paperwork, he had no option but to terminate her. (Wood Dep., at 31:24-32:3.) Wood had never before dealt with an employee who claimed a derived veteran's preference and did not recall other instances of individuals receiving such a preference. (Wood Dep., at 14:14-24; 16:13-19.) He had also never used the VetGuide before. (Wood Dep., at 89:17-20.)

Wood did not receive any other documents from Spence. Two months later, September 27, 2010, he gave Spence a termination memorandum stating that he proposed to fire her in one week

because she did not qualify for the derived veteran's preference. (Ex. 24 to Dowdy Decl. [Docket Item 46-9].) The memorandum noted that in order to qualify for the derived veteran's preference, Spence must meet one of the three criteria listed in the OPM VetGuide. The letter went onto say that Spence did not qualify under the first criteria because the VA letter stated that Spence's spouse was 30 percent disabled and not 100 percent disabled. The letter continued,

> Further, regarding the other two criteria above, there is no evidence that your spouse retired, was separated, or resigned from a civil service position or attempted to obtain a civil service position or other position along the lines of his usual occupation and failed to qualify because of a service connected disability. Therefore, your original appointment was not in accordance with the above regulation. As a result, the agency must rectify the erroneous action by terminating your appointment.

(Id.) Spence met with Wood the next week with a union representative. According to Plaintiff during the meeting, Spence's union representative told Wood that the OPM VetGuide allows for deviation from the criteria and for "other circumstances" to be considered in determining an individual's eligibility for derived preference. (Pl. Supp. SMF ¶ 20.) However, since Spence was unable to come up with any additional paperwork, Wood decided that she should still be fired. In his affidavit submitted to this Court, Wood stated that he was the sole decision-maker in Spence's termination and that he did not

14

seek any input from Spence's managers in making his decision.
(Def. SMF ¶ 63; Wood Decl. ¶ 19; Wood Dep., at 53:18-20.)
Venetos also testified that although he was the one who told
Rebecca the news, the decision was made by HR. (Venetos Dep., at
31:6-14.) Spence disputes this fact but does not offer any
evidence contradicting Wood's affidavit. (Pl. Counter SMF, Resp.
to ¶ 63.)

Spence's termination became effective October 15, 2010. At
around the time she was fired, Spence, through her union
representative, told Wood that Spence's husband held a "dual
service" position with the Air National Guard as a member of the
Air Force and also as a technician in the federal civil service.
(Pl. Supp. SMF ¶ 24; Emails from Gerry Berry, Ex. G to Naqvi
Decl. [Docket Item 54-7]; Def. Resp. to Supp. SMF ¶ 24.) If
Spence's husband had been discharged due to his disability from
a job that counted as a civil service position, Spence would
have qualified for the derived preference under the second
criteria listed the VetGuide. Edwards and Wood tried to confirm
this fact but were unable to do so. Edwards called the Air Force
personnel office at least once but did not receive a response.
(Wood Dep. 30:15-31:11; 55:3-11.) Wood believed, based on his
experience having a son in a "dual service" position, that a
Standard Form 50 ("SF-50") was filed for every personnel action

15

taken in a federal civil service position. He asked Spence to
bring in an SF-50 documenting her husband's discharge from the
civil service position, but Spence did not have it. (Wood Decl.
¶ 18.) Because HR could not verify that Spence's husband held a
dual service position with the Air Force, Wood did not credit
Spence's assertion.

After Spence was terminated from her permanent position,
she was assigned to a temporary position on the same team two
weeks later. The position lasted approximately three months
until February 2011. (Ex. 27 to Dowdy Decl. [Docket Item 46-
10].) At some point, Spence filed a complaint with the Merit
Systems Protection Board appealing the decision to terminate her
position and also filed a complaint with the FAA's Equal
Employment Opportunity Office.

According to Spence, Venetos, Spence's supervisor, had
acted "increasingly hostile and intimidating" towards her after
she filed her complaint. (Pl. Supp. SMF ¶ 25; Spence Decl. ¶
19.)[4]

Shortly before she returned to work on the temporary

---

[4] Defendant's primary response is that the following facts are
immaterial to Spence's retaliation claim. (See Def. Resp. to
Supp. SMF ¶¶ 25-35.) To the extent Defendant fails to make clear
any dispute with respect to the facts, the Court will deem any
such fact undisputed for purposes of the pending motion, and
will address the materiality of these facts in Part III, below.

position, Venetos emailed Jan Edwards to ask whether Spence could "telework" from home. (Pl. Supp. SMF ¶ 26; Ex. I to Naqvi Decl. [Docket Item 54-9]) Venetos did not recall why he proposed the teleworking arrangement, but speculated that it might have been because Spence no longer had access privileges to the FAA's computers. (Venetos Dep., at 62:22-63:11.)

For Spence's temporary assignment, Venetos asked Spence to train a former co-worker, a Caucasian female, to take over her duties on the team headed by Venetos. (Pl. Supp. SMF ¶ 28; Def. Resp. to Supp. SMF ¶ 28; Venetos Dep., at 22:21-23:8, 72:18-73:15.) The co-worker, Tammy Lusk, told Spence that she had a law degree and no experience related to Spence's position. (Pl. Supp. SMF ¶ 29; Spence Decl. ¶ 21.) Spence was then transferred to work on another team. At some point, her new manager, Annie Clark, petitioned Venetos and Wood to convert her temporary position into a permanent one, but was told by Wood and Venetos that that would not happen. (Pl. Supp. SMF ¶ 30; Spence Decl. ¶ 20.)

Although the parties dispute whether Spence received an offer of reemployment from the FAA, a closer examination of the record shows that no formal offer was ever extended. On February 1, 2011, a few days before her temporary assignment was to end, Spence participated in a mediation session with an EEOC

17

representative and Donna Young-Talley, Edwards' supervisor who was then the Acting Director of Human Resources. (Pl. Supp. SMF ¶ 32.) Spence states that during the mediation, Young-Talley assured Spence that she had the requisite authority to make an offer of re-employment, and made an offer which was later rescinded to re-hire Spence. (Pl. Supp. SMF ¶ 32-33.) However, according to emails from the EEOC representative, Young-Talley did not have settlement authority, and had proposed a "tentative resolution" during the mediation, subject to approval from the General Counsel and Vice President. (Ex. J to Naqvi Decl. [Docket Item 54-10], at 2.) The FAA later informed Spence's EEOC representative that they decided not to extend the offer. (Id. at 3.) These facts are consistent with Defendant's statement, made in response to Plaintiff's interrogatory, that no offer was ever made to Spence. (Ex. 37 to Dowdy Decl. [Docket Item 56-2] ("[D]efendant states that its representatives did not make any 'offers,' verbal or written, to plaintiff in connection with the EEO mediation.")

Spence's temporary assignment ended on February 4, 2011. (Ex. 31 to Dowdy Decl. [Docket Item 46-11].) She was not re-hired.

**III. ANALYSIS**

  **A. Standard of Review**

18

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The Court must review the facts and draw all inferences in light most favorable to the non-moving party, in this case plaintiff Rebecca Spence. Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

The question on summary judgment is whether the evidence presents "sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment must be granted. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

**B. Discrimination Under Title VII**

The purpose of Title VII of the Civil Rights Act of 1964 is

19

to "assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973). Towards that end, Title VII prohibits an employer from firing, "or otherwise [] discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Spence brings three claims of discrimination under Title VII: discrimination on the basis of race (Second Cause of Action), national origin (Third Cause of Action), and religion (Fourth Cause of Action).

A discrimination claim brought under Title VII is analyzed according to the familiar burdenshifting approach set out in McDonnell Douglas. The plaintiff bears the initial burden of setting forth sufficient facts to establish a prima facie case for discrimination. To make out a prima facie case of discrimination, the plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action despite being qualified; and (4) similarly situated persons who are not

members of the protected class were treated more favorably, or
that the circumstances of the termination give rise to an
inference of discrimination. <u>Sarullo v. U.S. Postal Service</u>, 352
F.3d 789, 797 (3d Cir. 2003) (citing <u>McDonnell Douglas</u>, 411 U.S.
at 802); <u>Abramson v. William Paterson College of New Jersey</u>, 260
F.3d 265, 281-82 (3d Cir. 2001); <u>Matczak v. Frankford Candy and
Chocolate Co.</u>, 136 F.3d 933, 939 (3d Cir. 1997).

     If a prima facie case is properly established, the burden
shifts to the defendant employer to proffer some legitimate,
nondiscriminatory reason for its actions. If the defendant does
so, the presumption of intentional discrimination disappears but
the plaintiff may still prevail by showing that the employer's
proffered reason was merely a pretext for discrimination and not
the real motivation for the unfavorable employment decision. <u>St.
Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 510-11 (1993). To
survive summary judgment, it is enough for the plaintiff to
point to "some" evidence by which a factfinder could reasonably
conclude that the defendant's proffered reasons were fabricated.
<u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994). However, to
discredit the defendant's reasons, the plaintiff "cannot simply
show that the employer's decision was wrong or mistaken, since
the factual dispute at issue is not whether the employer was
competent, but whether discriminatory animus motivated the

adverse decision. Id. at 765.

The Court first holds that Spence has not established a prima facie case of discrimination on the basis of national origin.[5] Although Spence asserted a claim of national origin discrimination under Title VII, the Court cannot find any assertion of Spence's national origin in the Complaint. The record contains no reference to her national origin, nor does it suggest that there was discrimination against Spence because of her national origin. In addition, Spence makes no argument in support of this claim in her brief. The Court will therefore grant summary judgment in favor of defendants on Count III.

Plaintiff's claims of discrimination on the basis of race and religion require a more detailed discussion. There is no dispute that Spence has satisfied the first and third prongs of the prima facie case. Both parties agree that Spence, an African American and practicing Muslim, is a member of a protected class and was subject to an adverse employment action.

Whether Spence was qualified for the position is a closer call. Although a plaintiff need not show that she was more qualified than other candidates, at the very least she must be

_____

[5] Under Title VII, "[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." Espinoza v. Farah Mfg. Co., 414 U.S. 86, 88 (1973).

as qualified as the other candidates in the pool. See Bennun v. Rutgers State Univ., 941 F.2d 154, 171 (3d Cir. 1991) (plaintiff who was denied promotion must demonstrate in prima facie case that he or she "'was sufficiently qualified to be among those persons from whom a selection, to some extent discretionary, would be made.'" (quoting Roebuck v. Drexel Univ., 852 F.2d 715, 726 (3d Cir. 1988))); Pinckney v. Northhampton Cnty., 512 F. Supp. 989, 998 (E.D. Pa. 1981) (holding that plaintiff must show that she was as qualified as other candidate in order to satisfy the second prong of the prima facie case).

In this case, it is undisputed that the only external candidates who were referred for hiring were those who met the minimum qualifications and who were eligible for a veteran's preference. (Def. SMF ¶ 16; Pl. Counter SMF, Resp. to ¶ 16.) It is also undisputed that Spence, who was chosen from the referral list, met the minimum qualifications of education and specialized experience. The question of whether Spence was as qualified as the other candidates for the position (and hence whether she has met the second prong of the prima facie case) turns on whether she was actually eligible for a veteran's preference.

Although Spence argues that she was entitled to a derived veteran's preference as the spouse of a disabled veteran, the

23

evidence in the record does not support her eligibility claim. According to the OPM VetGuide, a spouse of a disabled veteran is presumed qualified for the derived veteran's preference in three circumstances: (1) the veteran is rated by the Department of Veterans Affairs to be 100 disabled or unemployable; (2) the veteran has been separated from a civil service position because of his disability; and (3) the veteran has tried to obtain and has failed to qualify for a civil service job because of his disability.

Spence has not shown that she falls into any of the three categories. Spence's husband was rated 30 percent disabled by the VA, and she therefore did not qualify under the first category. Nor did she qualify under the second category because, according to Spence, her husband had never held a civil service position. On the SF-15 form which Spence submitted shortly after she was hired, she checked that her spouse had never been employed by the federal civil service and that he had never been separated from a federal civil service position because of his disability. In July 2010, when Wood asked Spence whether her husband had ever held a federal civil service position, Spence informed Wood that he had not.[6]

---

[6] In her opposition, Spence states that in addition to being honorably discharged from the Air National Guard Reserves, her husband "was also relieved from his assignment at the 177th

Spence argues that she qualified for the veteran's preference under the third prong because her husband had tried without success to obtain a civil service job as an aircraft mechanic following his discharge from the Air National Guard. (Pl. Opp'n 12.) For support, Spence cites to the fact that she told Edwards when she was first hired that her husband was unable to find work due to his injury. (Id.) Spence's statement to Edwards, however, is contravened by other evidence in the record which Spence fails to dispute or explain. In the SF-15 form, Spence checked that her husband had never been disqualified for a federal civil service position because of his disability. Moreover, in July 2010, Edwards asked Spence for

---

Aircraft Maintenance Squadron, where he was employed as an aircraft mechanic." (Pl. Opp'n 12.) It is unclear whether Spence is arguing that her husband's position with the Air National Guard Reserves also counted as a federal civil service position, and that she therefore qualified for the derived preference under the second category. To the extent Spence makes this argument, the Court must reject it, since Spence does not point to any evidence in the record to suggest that her husband's position in the Air National Guard Reserves was also a civil service position. Spence references the Special Order AR-143, but the AR-143 states only that Spence's husband was relieved from assignment with the Aircraft Maintenance Squadron and discharged from the Air National Guard. (Ex. 19 to Dowdy Decl. [Docket Item 46-8].) AR-143 appears to be a military order signed by a Lieutenant Colonel of the New Jersey Air National Guard; nothing in that document suggests that Spence was being relieved from a civil service position. Moreover, when Spence was asked for additional information to support her union representative's late assertion that her husband held a dual military and civil service position with the Air National Guard, she was unable to provide any paperwork.

additional information to support her eligibility claim. Spence
had an opportunity then to submit documents showing that her
husband had in fact applied and been disqualified from civil
service jobs because of his disability, but she stated that she
had no documents to provide. In addition, when Wood later asked
Spence whether her husband had <u>ever</u> applied for a federal civil
service position, Spence replied that he had not. Spence was
ultimately unable to produce <u>any</u> paperwork showing that her
husband had tried and failed to qualify for a civil service
position because of his disability.[7] In light of the evidence in

---

[7] Spence provides no support for her argument that documentation
was not required to show her qualification under the third
prong. Spence cites <u>Redus v. U.S. Postal Service</u>, 88 M.S.P.R.
193 (M.S.P.B. 2001), but that case is inapposite. In <u>Redus</u>, the
appellant had submitted documentation from the VA that her
spouse was 100 percent disabled and mentally incompetent. The
court held that the documentation was sufficient to show that
the appellant was preference eligible, and no additional proof
was necessary to qualify under the first prong. <u>Id.</u> at 197-98.
<u>Redus</u> says nothing about what is required to show eligibility if
the veteran is not 100 percent disabled, as is the case here,
and other cases suggest that supporting documentation is
generally required to prove eligibility for a veteran's
preference. <u>See</u>, <u>e.g.</u>, <u>Zamot v. Merit Sys. Prot. Bd.</u>, 332 F.3d
1374, 1378-79 (Fed. Cir. 2003) (upholding Board's finding that
it lacked jurisdiction to hear case because appellant did not
provide sufficient documentation proving that he was a
preference-eligible veteran); <u>Carey v. U.S. Postal Service</u>, 50
M.S.P.R. 359, 360-61 (M.S.P.B. 1991) (holding that
administrative judge correctly found that appellant did not
prove that she was preference eligible when she failed to submit
documents showing that she received disability compensation, but
remanding to consider additional evidence).
    Spence argues that because she had proof that her husband
had been discharged from the Air National Guard as an aircraft

the record, Spence cannot establish that she qualifies for the veteran's preference under any of the prongs. She therefore cannot show that she is qualified for the position.

Spence has also not shown that she satisfies the fourth prong of the prima facie case. There is no evidence suggesting that other individuals not in a protected class were allowed to stay on despite a later finding that they did not meet the qualifications. Indeed, Wood testified at deposition that he did not recall the FAA ever allowing someone hired on a veteran's preference to stay if they did not meet the preference criteria, and testified that there were no regulations in place for retaining an employee under the veteran's preference even though the preference requirements were not met. (Wood Dep., at 92:9-24.) Absent evidence of disparate treatment, the Court holds Plaintiff has failed to demonstrate a prima facie case of discrimination in violation of Title VII.

---

mechanic due to his injury, there was no need for additional documentary proof that he was unable to find other jobs as an aircraft mechanic. (Pl. Opp'n 13.) In addition to being unsupported, this argument is unpersuasive. That Spence's husband left his job in the military due to an injury says nothing about whether he was disqualified from a similar job in the civil service. See OPM VetGuide, at 1 (spouse must demonstrate that the veteran is disqualified for federal civil service employment and therefore unable to use the preference for him- or herself).

Although the record shows that Spence has not satisfied the prima facie case, even if a prima facie case were present it is clear that Defendant has articulated a legitimate, nondiscriminatory reason for firing Spence, and that reason has not been addressed by evidence that the reason is pretextual.

Wood fired Spence because he believed she was not eligible for the veteran's preference. Spence was chosen from a short list of external candidates who were referred for hiring because they all claimed a veteran's preference on their application. The internal audit, as discussed above, later uncovered that Spence's file did not contain support for her claim of eligibility for a derived veteran's preference. Because of that, the audit team deemed Spence an "illegal appointment" and notified HR, which was tasked with taking corrective action. Edwards and Wood asked Spence for documents showing that she now qualified for a derived preference, but the documents Spence provided fell short. The VA letter, which was produced months after her hire, showed that her husband was not 100 percent disabled. Moreover, Spence's SF-15 form suggested that Spence did not qualify under either the second or third prong because she checked that her husband had never been disqualified from the civil service and had never been employed by the civil service. Spence was unable to provide any evidence to

demonstrate otherwise. When Spence's union representative told Wood that Spence's husband had held a dual military and civil position with the Air Force, Edwards called the Air Force but did not receive a response. Wood also asked Spence to provide a copy of an SF-50 form which is used in federal civil service jobs, but Spence could not provide that either. Because Spence could not substantiate her claim of eligibility with evidence, Wood decided that Spence had to be terminated.

Spence attempts to rebut Defendant's proffered explanation in several ways. First, Spence argues that Defendant's reasoning is suspect because Spence did in fact qualify for the veteran's preference. But as the Court has already explained, the record does not contain admissible evidence that Spence satisfied the criteria. Even if Spence had actually been eligible for the preference, the fact that Wood was wrong or mistaken about her eligibility is not by itself sufficient to discredit his reasoning, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

Nor does the fact that Edwards and Wood wanted Spence to provide supporting paperwork suggest that they acted with discriminatory animus. As explained above, Spence's SF-15 form

suggested that she did not meet the criteria for a derived veteran's preference. In addition, this was the first audit for the FAA Tech Center, and the audit team had informed Wood that Spence was an "illegal appointment." Wood testified to his belief that termination under this circumstance was necessary because "we didn't have the evidence to support the derived preference." (Wood Dep. 61:11-18.) No reasonable jury could have found that Wood's request for documentation was suspect under these circumstances, particularly in light of Spence's contradictory statements and the SF-15 suggesting her ineligibility.

Spence argues that the OPM Guidelines required Defendant to make an effort to keep her employed by applying to the OPM for an exception, and the fact that Defendant did not do so shows pretext. (Pl. Opp'n 14-15.) As an initial matter, contrary to Spence's contention, the Guidelines do not mandate employers to apply for an exception in the case of an illegal hire. The OPM Guidelines on Variations to Staffing Regulations ("OPM Guidelines on Variations") permits the OPM to grant a variation from the regulations "whenever precise compliance with [the regulations] would impose practical difficulties and unnecessary hardship . . . ." (OPM, Variations to Staffing Regulations ("OPM Variations") [Docket Item 54-8], Ex. H to Naqvi Decl., at 5.)

30

Under the section "Variation to Correct Erroneous Appointment," the Guidelines state that an agency "should try to put the employee on a legal appointment" if an employee is on an illegal appointment, and the OPM will not consider a variation request unless the agency has first made extensive efforts to regularize the appointment. (Id. at 6.)

A reasonable jury could not infer from the evidence in the record that Defendant's failure to apply for an exception in Spence's case was pretext for discrimination. Nothing in the record suggests that the failure was anything more than a legitimate error based on Wood's interpretation of the VetGuide and the derived veteran's preference. At deposition, Wood testified that he did not have any background in using the VetGuide and was unfamiliar with the specific paperwork requirements for candidates claiming a veteran's preference. (Wood Dep., at 25:10-26:3.) Wood had never before encountered an employee claiming a derived veteran's preference. He was unaware of any rules or regulations that were in place for authorizing a veteran's preference which did not meet the enumerated requirements. (Wood Dep., at 92:9-24.) Wood testified that he did not know that an exception was possible if Spence did not qualify. He was unaware that the FAA could apply to OPM for an exception to the regulations. (Wood Dep., at 93:6-18.)

Importantly, Spence does not point to any evidence in the record which would call Wood's testimony into question.

The Court must also reject Spence's argument that a hostile and discriminatory workplace environment motivated the firing decision.[8] Spence lists roughly two dozen negative comments referencing her head covering or her religious beliefs. However, the vast majority of those comments were made by co-workers and other individuals employed by the FAA. None were made by Edwards, Wood, Talley-Young, or anyone on the audit team that determined that Spence's veteran's preference claim needed more support. Moreover, Spence offers no evidence suggesting that HR or the audit team was influenced or even aware of the comments made by her co-workers. Spence argues that as head of HR, Wood would have known about these discriminatory remarks, but Spence points to nothing in the record showing that employees had complained to HR about discriminatory remarks, or that Wood was present when such remarks were made. Nor is there anything in the record to suggest that Wood was aware of any racial or religious hostility directed towards Spence.

Three comments came from Spence's managers. John Wiley, the manager who signed off on Spence's hire, said to her, "[T]hey

---

[8] The Court dismissed Spence's hostile work environment claim in an opinion dated January 28, 2013 [Docket Item 27].

don't like Muslims," and "It was bad enough having one, now there's two." Spence's direct supervisor, Isidore Venetos, also told Spence that he bought a Quran because he wanted to understand her and her religion. Even assuming that these remarks raise the specter of discrimination, they do not show discriminatory animus in Spence's firing because the evidence suggests — and Spence has not shown otherwise — that Venetos and Wiley played no role in the decision to fire her. Wood stated that he alone decided that Spence had to be let go, and that he did not consult with any of Spence's supervisors in making that decision. Venetos also testified that although he was the one who told Rebecca the news, the decision was made by HR and Venetos had no choice in the matter. Spence does not point to anything in the record suggesting that Wood was influenced by Venetos and Wiley.

Because Spence has not produced sufficient evidence to refute Defendant's explanation for her termination, the Court will grant Defendant's motion for summary judgment on the discrimination claims under Title VII.

### C. Retaliation Under Title VII

Title VII prohibits and employer from discriminating against an employee "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter

. . . ." 42 U.S.C. § 2000e-3(a).

To establish that an unfavorable job action is based upon an illegal retaliatory motive in violation of Title VII, a plaintiff must first establish a prima facie case of retaliation. The plaintiff must show that (1) she was engaged in protected activity; (2) she was subject to a materially adverse employment action; and (3) there is a casual link between the protected activity and the subsequent adverse job action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006). Under the third element, a plaintiff must link the harassment at work to a retaliatory animus. Although the plaintiff need not prove that retaliation was the sole reason for an employer's adverse action, he or she must show that the action would not have been taken but for his or her protected activity. LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n, 503 F.3d 217, 232 n. 8 (3d Cir. 2007) (citing Watson v. SEPTA, 207 F.3d 207, 215 (3d Cir. 2000)).

The burden-shifting scheme also applies to retaliation claims. Once the plaintiff establishes a prima facie case of retaliation, the defendant must come up with a legitimate, non-retaliatory reason for its conduct. The plaintiff must then show that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment

action. Moore, 461 F.3d at 342; Sarullo v. U.S. Postal Serv.,
352 F.3d 789, 799-800 (3d Cir. 2003). To survive summary
judgment, "a plaintiff must produce some evidence from which a
jury could reasonably reach these conclusions." Moore, 461 F.3d
at 342 (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.
1994)).

According to Spence, after she filed complaints with the
EEO Office and the Merit System Protection Board, Defendant
retaliated against her after she was placed on temporary
assignment which lasted approximately three months. As evidence
of adverse action, Spence states that she began to be treated in
a more hostile manner, that Venetos inquired into whether Spence
could complete her temporary assignment from home, and that
Venetos tasked Spence solely with training her replacement.
Spence additionally states that when she voluntarily transferred
to another team, Wood and Venetos rejected her new supervisor's
application to give her a permanent position. Finally, Spence
claims that Defendant rescinded a job offer made during an EEO
mediation session. (Pl. Opp'n 19-20.)

The Court agrees with Defendant that a reasonable jury
would not be able to find in favor of Spence. The record does
not support a prima facie case of retaliation because Spence has
not shown a causal link between the protected activity and the

alleged retaliatory acts. Although Spence does not state exactly
when she went to the EEO, a Counselor's Report from the
Department of Transportation indicates that she first contacted
the EEO on November 29, 2010, approximately one month into her
temporary assignment. (Ex. 35 to Dowdy Decl., at 2.) As evidence
of retaliation, Spence points to an email from Venetos to
Edwards asking whether Spence could complete her work from home,
and to Venetos' decision to limit Spence's temporary assignment
to training her replacement, Tammy Lusk. (Pl. Supp. SMF ¶¶ 26–
28.) But the deposition transcript shows that Venetos had come
up with Spence's temporary assignment before or around the time
Spence began work on November 2, and the email from Venetos
shows that he had asked about a teleworking arrangement on
October 28. (Ex. I to Naqvi Decl.; Venetos Dep., at 62–65.) Both
of these events occurred nearly one month *before* Spence went to
the EEO and therefore do not raise an inference of retaliation.

   Nor does Venetos' hostility towards Spence suggest
retaliation. Spence admits elsewhere that her relationship with
Venetos had already deteriorated by the time she notified the
EEO. For example, in her affidavit, Spence asserts that Venetos
became "increasingly hostile" "during the time between when in
September 2010 Mr. Wood first informed me that my appointment
might be terminated and October 2010 when he finally advised me

that there was nothing that could be done to keep me employed."
(Pl. Supp. SMF ¶ 15-17.) In her opposition brief, Spence also
states, "[O]nce it was determined that [Spence] was 'illegally'
appointed to an FAA position, she was treated in a more hostile
manner." (Pl. Opp'n 19.) Because Spence has provided no evidence
showing that Venetos' hostility increased *after she filed her
EEO complaint*, no inference of causation may be drawn. See
LeBoon, 503 F.3d 217, 233-34 (3d Cir. 2007) (evidence
insufficient to show causation where employee had strained
relationship with supervisor during last several months of her
employment and had not shown that there was a qualitatively
different relationship with supervisor after she made her
complaint).

Spence notes that Venetos and Wood denied a request by
Spence's manager in another department, Annie Clark, to convert
her temporary position with Clark into a permanent one. The
Court agrees with Defendant that this does not support an
inference of retaliation or increased hostility. Nothing in the
record suggests that Venetos and Wood's refusal to create a new
permanent position for Spence had something to do with her
complaint to the EEO. There is no evidence that Venetos, a
supervisor in another department, and Wood, the Human Resources
Manager, even had the authority to create a new permanent staff

position intended specifically for Spence in another department.
Nor is there any evidence to suggest that Spence was promised a
permanent position if she performed well during her temporary
assignment. Moreover, Spence does not state when Venetos and
Wood denied Clark's request; thus no inference may be made based
on temporal proximity that the denial was due to Spence's
complaint to the EEO. See LeBoon, 503 F.3d at 233 (three-month
delay between protected activity and adverse action, without
more, cannot create an inference of causation). Since Spence
does not point to any other evidence which would suggest
causation, the record is insufficient for a reasonable fact-
finder to find retaliatory animus.

　　　As for the offer of reemployment that was later rescinded,
it too fails to support a claim of retaliation.[9] Spence had been
given a tentative offer of reemployment during the EEO mediation
process, which was initiated *after* she had already filed her EEO
complaint. Spence's EEO complaint therefore allowed Defendant to
make an offer of reemployment in the first place. Plaintiff's
conclusion that Defendant withdrew an offer in retaliation for

───────────────

[9] Defendant argues that the evidence is inadmissible under
Federal Rule of Evidence 408(a). However, statements made during
settlement negotiations are admissible "when offered for another
purpose," Fed. R. Evid. 408(b), such as to establish "an
independent violation (here, retaliation) unrelated to the
underlying claim which was the subject of the correspondence."
Carney v. Am. Univ., 151 F.3d 1090, 1095 (D.C. Cir. 1998).

Spence's EEO complaint does not logically follow when her complaint was what prompted the offer of reemployment in the first place. There is no other evidence in the record to suggest a causal link between Spence's complaint and the withdrawal of the offer. Moreover, Defendant has shown a legitimate, non-retaliatory explanation for the withdrawal, which Spence cannot rebut. The emails submitted by Spence as part of the record show that Donna Young-Talley, the FAA representative who participated in the mediation session with Spence and an EEO representative, had offered a "tentative resolution" during the mediation on February 1, 2011, which still needed final approval from the General Counsel and Vice President of the FAA because "the agency did not send participants [to the mediation] with settlement authority." (February 4, 2011 Email from Deborah Sherman, Ex. J to Naqvi Decl., at 2.) Three days later, Young-Talley informed the EEO representative that the FAA was "not able to come to a resolution." (Feb. 4, 2011 Email from Donnas Young-Talley, id. at 1.) The emails therefore suggest that that the tentative offer did not receive final approval from the General Counsel and Vice President, which was the reason why it was "withdrawn."

Because Spence has not established a prima facie case of retaliation, the Court will grant Defendant's motion for summary

judgment on the retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment.  The accompanying Order will be entered.


**December 30, 2014**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         Chief U.S. District Judge

40